# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Michael T. Mason | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 2290 | **DATE** | 7/29/2003 |
| **CASE TITLE** | Shirley Stallings-Daniel vs. The Northern Trust Company | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the attached Memorandum Opinion and Order, plaintiff's motion for leave to file a surreply to defendant's reply in support of its motion for summary judgment [135-1] is granted, defendant's motion to strike the affidavit of Alex Razumovich [119-1] is granted, defendant's motion to strike portions of plaintiff's Rule 56.1 response to defendant's Rule 56.1 statement of undisputed facts [118-1] is granted in part and denied in part, defendant's motion to strike plaintiff's affidavit [120-1] is granted in part and denied in part and defendant's motion for summary judgment [106-1] is granted in part and denied in part. Status hearing set for 8/13/03 at 9:00 a.m. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **2** |
| | No notices required. | | number of notices |
| ✓ | Notices mailed by judge's staff. | | 7/31/03 |
| | Notified counsel by telephone. | | date docketed |
| | Docketing to mail notices. | | docketing deputy initials |
| | Mail AO 450 form. | | 7/28/2003 |
| | Copy to judge/magistrate judge. | | date mailed notice |
| KF | courtroom deputy's initials | Date/time received in central Clerk's Office | KF6 mailing deputy initials |

**Document Number** 140

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
JUL 3 1 2003

SHIRLEY STALLINGS-DANIEL )
)
Plaintiff, )
)
v. )   No. 01 C 2290
)
THE NORTHERN TRUST COMPANY, )   Mag. Judge Mason
)
Defendant. )

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Plaintiff, Shirley Stallings-Daniel, has sued her employer, The Northern Trust Company ("TNT") for violations of Title VII of the 1964 Civil Rights Act as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e-2 *et.seq.* ("Title VII") and 42 U.S.C. § 1981, alleging that her employer discriminated against her on the basis of her race by not promoting her as quickly as similarly situated Caucasian employees, and that she was unfairly removed from a management position and otherwise retaliated against because she complained of discrimination. Defendant has moved for summary judgment. For the following reasons, we grant in part and deny in part defendant's motion.

## FACTS

Each party submitted a statement of undisputed material facts, and a response to the other party's facts, as required by Fed.R.Civ.P. 56.1. While both parties' statements and corresponding exhibits are well organized, they also suffer from certain flaws, and defendant has moved to strike both portions of plaintiff's response to defendant's

*140*

statement as well as two affidavits she submitted in support of her statement of facts.[1] Before setting forth the facts that are not in dispute, we must address a few of these issues.

Defendant has filed three motions to strike. The first two ask that we strike portions of plaintiff's affidavit and the entire affidavit of her subordinate, Alex Razumovich, which she submitted in support of her opposition to the motion for summary judgment and her Rule 56.1 statements. Defendant argues that the affidavits are deficient because they, 1) contain hearsay statements for which there is no exception; 2) contain statements for which the affiant lacks personal knowledge or a proper factual foundation; and 3) contain statements which are argumentative or legal conclusions. District Courts have the discretion to enforce their local rules (or excuse transgressions), such as those governing the filing of summary judgment motions. *See, e.g., Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995).

In response to the hearsay argument, the plaintiff admits that a few paragraphs of her affidavit should correctly be stricken,[2] and contends that others are admissible either because they consist of party admissions (paragraphs 3, 5, and 23 of plaintiff's affidavit), or are not offered for the truth of the matter asserted (paragraphs 61 and 62). As to paragraphs 3, 5, and 23, plaintiff has been unable, even when directly asked, to identify any manager or agent of defendant who made these statements. Thus, they are not

---

[1] Plaintiff has also moved to file a sur-reply to correct several alleged errors in defendant's reply brief regarding its attempts to find plaintiff another position after she was removed from her team leader role. Although we find that most of plaintiff's points go to interpretation of the facts rather than identification of actual errors, we will grant her motion.

[2] Specifically, plaintiff agrees to strike paragraphs 16 and 80 of her affidavit based on a hearsay objection.

proper admissions of a party opponent and will be stricken. Fed.R.Ev. 801(d)(2). Paragraphs 61 and 62 relate that plaintiff learned from an unnamed individual that another co-worker allegedly made certain statements about her. This "hearsay inside of hearsay" is offered for the truth of the matter asserted, and thus is stricken. However, to the extent that plaintiff can prove the event through other means, such as an e-mail from the speaker, she is still allowed to do so.

In response to defendant's other arguments, plaintiff argues generally that the Court can easily glean from the statements made and other evidence adduced that plaintiff and her subordinate Razumovich have personal knowledge about the matters to which they aver. Plaintiff also contends that with regard to defendant's "no foundation" argument, defendant's own e-mails and business documents properly substantiate the statements. In support of this contention, plaintiff cross references some of her affidavit statements with evidence provided by defendant.

Defendant's third motion asks that we strike portions of plaintiff's Rule 56.1 response to defendant's Rule 56.1 statement of undisputed facts based on similar alleged deficiencies. Specifically, defendant contends that many of plaintiff's numbered paragraphs contain argument or speculation, fail to identify evidence that provides an adequate basis to deny defendant's statement, or consist of additional facts which properly belong in plaintiff's own 56.1 statement.

We have reviewed all of the parties' 56.1 statements and responses, along with the evidence cited. We agree with the defendant that the affidavit of plaintiff's subordinate should be stricken because it does not contain first-hand knowledge about material facts, and thus is ineffective as proof. Additionally, some parts of plaintiff's own affidavit, as well

3

as portions of her Rule 56.1 response contain material that should not be considered when we determine whether there is a dispute of material fact, primarily because they contain statements that demonstrate either a lack of personal knowledge or unsubstantiated speculation.[3] However, as plaintiff points out, some of defendant's arguments in support of striking actually go to the weight we assign to a particular fact rather than its admissibility per se. Also, a large number of the statements propounded by both parties are not material to our analysis anyway, and thus, it is unnecessary to review each paragraph in defendant's motion individually. Instead, when our determination of a particular fact depends on discounting a statement or piece of evidence propounded by the plaintiff (or, for that matter, the defendant), we will say so explicitly. Therefore, defendant's motion to strike the affidavit of Alex Razumovich is granted and its motions to strike portions of the plaintiff's affidavit portions of plaintiff's Rule 56.1 response are granted in part and denied in part as stated further below.

Following is a statement of the undisputed material facts in this case, which we set forth subject to our holding above.[4] The events about which plaintiff complains occurred in 1998 and 1999. However, a little background of her employment with TNT and defendant's

---

[3] We disagree with plaintiff's assertion that we can use defendant's own documents to substantiate her statements of fact and affidavit. As we detail further below, plaintiff persists in a habit that colored many of her previous motions to compel in this court, that of offering unsubstantiated speculation about the meaning of various e-mails and other records of defendant as fact, or paraphrasing deposition testimony or documents. We will note such instances as they arise.

[4] In determining those facts on which the parties agree, we note that in many cases, the dispute centers more on the proper interpretation of a fact or event than its truth. Often, the parties agree that certain e-mails were sent, meetings were attended, etc., but dispute their importance or purpose. Where appropriate, we will note such disagreement, keeping in mind that we cannot accept a particular parties' interpretation absent evidence.

organizational structure[5] is necessary to understand the scope of her allegations. Shirley Stallings-Daniel began working for TNT in 1990 as an Associate Programmer. When she was hired, she participated in a programmer training class with other newly hired employees. At some point prior to 1993, Plaintiff began working in the Trust Systems Department ("TSD") of defendant's World-Wide Operations and Technology business unit ("WWOT"). The WWOT had two Units, Operations and Technology; TSD was part of the Technology Unit, which was responsible for building and maintaining the computer systems for TNT. From at least April, 1995 to June, 1999, plaintiff was employed in a division of TSD known as Trust Accounting.

Plaintiff alleges that as early as 1992, her promotions began to trail those of her non-African-American peers.[6] However, she never adequately identifies who these peers are. At one point, she indicates that her peers are those individuals with whom she participated in her original programmer training class. However, of the individuals who were still employed by defendant at the time of their promotions, some were not working in the TSD, and all had different supervisors than the plaintiff. Further, there is absolutely no evidence to support plaintiff's "understanding" that, absent performance problems, all members of a training class were promoted together.[7] Thus, to the extent that it is relevant to her claims

---

[5] We found TNT's organization somewhat confusing, since it uses words such as "division", "unit", "department" and "team" to describe more than one level of structure.

[6] Specifically, plaintiff alleges that all of her Caucasian peers in the TSD had been promoted to Systems Analyst by August, 1993, but she was not promoted until October, 1993. Plaintiff does not identify which of her training class "peers" were still in the TSD at the time.

[7] Indeed, one of plaintiff's later supervisors, Kay Vicino, testified that one of her own promotions had occurred several months later than that of other employees with whom she had been hired, even though all of them had come from the same previous employer and had performed the same job there. Vicino had

(continued...)

of later discrimination, we make no finding regarding plaintiff's allegation that her early promotions were delayed because of her race.

By January, 1995, plaintiff was working on the Valuations Team in the Trust Accounting Division.[8] Sharon Alexander became plaintiff's supervisor in mid-1995; Brian Palmer was her second-level supervisor. In June, 1996, plaintiff was promoted to the official title of "Officer". She continued to hold functional titles that described her position as well. Plaintiff contends that in early 1996 (presumably, prior to plaintiff's promotion in June), TNT had promoted all of plaintiff's "Caucasian class peers in the TSD" to the title of Officer. However, plaintiff again fails to identify who these individuals are or establish their promotion dates. At the time, only three individuals from plaintiff's training class were still employed at TNT, Rory Ross, Lisa Weller, and Wing Chark. Neither Weller nor Chark worked in the TSD.[9] It is unclear whether Ross worked in the TSD, but it is undisputed that he had different supervisors than the plaintiff. Defendant denies any implication that these three individuals were plaintiff's peers merely because they had trained together, and also denies any implication that there were not other individuals who might have been more properly considered plaintiff's peers.

---

[7](...continued)
questioned management about whether her performance was poor, and was assured that it was an oversight, similar to the response given to plaintiff.

[8] Plaintiff contends that she held the "lead role" for one section of Valuations and that her work was "outstanding". She then alleges that she was promised the lead role for both sections of Valuations but it was denied. However, the evidence Plaintiff adduces does not establish that there was a performance review category called "outstanding" or a position in Valuations known as "lead role". Plaintiff provides an undated, un-named page of handwritten notes that purports to be an update of her review discussing an expanded lead role, but provides no foundation for it.

[9] Chark worked in the Hong Kong Office and eventually applied for and received a position in a completely separate division.

*Defendant's Promotion Process*

In the WWOT, the planning for promotions to occur in a particular year takes place in the fourth quarter of the previous year. From 1997 through at least 1999, Peter Magrini was the Department Head of the TSD. He, along with the TSD's Division Managers reviewed the planning lists for official promotions throughout the year; managers could add or delete employees from the list, or change their date of promotion.[10]

With regard to official (as opposed to functional) promotions, the parties dispute whether the WWOT had a requirement that employees hold the title Officer for at least three years before becoming eligible to be promoted to Second Vice President ("2VP"). There are two documents which discuss the promotion process. Plaintiff relies on a general TNT document that states that an employee may be promoted to 2VP after two-to-four years as an Officer, assuming other conditions are met. Defendant admits the two-to-four year guideline, but relies as well on a second document specific to the WWOT, which states that there are two tracks for promotion, a management track and a technical track. Both tracks require at least three years as an Officer before promotion to 2VP. Plaintiff argues that this document refers only to the Operations Unit of the WWOT, as both tracks refer to operations and client contact, which are not present in the Technical Unit, and thus denies that the three year requirement is applicable to her. However, defendant explains, -- without contradiction -- that the promotion requirements for the Technology Unit, although not reduced to writing, are based off those of the Operations Unit, including the three-year

---

[10] Magrini, as head of the TSD, testified that he had final authority to make promotions in the TSD, subject only to the approval of the head of the WWOT. Contrary to plaintiff's assertion, this does not mean that promotions were decided at the WWOT level, and thus, every employee in the WWOT was her comparable. There is no evidence that Magrini had any influence on the promotions of non-TSD employees in the WWOT and it is undisputed that he oversaw the promotion process for plaintiff.

guideline.[11] The parties agree that outstanding performance and/or a proven track record as a manager are relevant to promotion; since we find no question of fact that the TSD, as part of the WWOT Technology Unit, had a general three-year wait between promotion to Office and promotion to 2VP, we accept defendant's additional contention that outstanding performance and/or management experience could make someone eligible for promotion in a shorter amount of time, but an earlier promotion was not required.

*Plaintiff Becomes a Team Leader*

In January, 1998, Kay Vicino became the Division Manager for the Accounting Division, taking over the position from Palmer. In this role, Vicino directly supervised Accounting Team Leader Sharon Alexander, who was plaintiff's direct supervisor. Alexander's duties subsequently increased, and she planned to create one or more team leader positions, who would report to her. Each team leader would be responsible for managing a particular computer application assigned to Alexander's overall Accounting Team. At some point in early 1998, Alexander decided to make an individual named Employee A the team leader over the Application 1 computer application. She also made plaintiff a team leader, over the Valuations application. Plaintiff took over this role in June, 1998.[12]

---

[11] Plaintiff makes much of the fact that defendant's Human Resources Consultant, Terri Reed, testified that with respect to promotions, "each group has their own internal procedures that they follow". Plaintiff makes an unsubstantiated leap of logic and argues that this sentence proves that the WWOT's Technology Unit did not follow the written guidelines of the Operations Unit, which contained the three-year requirement for promotion to 2VP. However, Reed also testified that each business unit could take the general corporate promotion guidelines and base their own procedures around these guidelines, and nothing in the evidence cited by plaintiff disputes defendant's evidence that the Technology Unit did, in fact, base its guidelines off of those of the Operations Unit, even if they were not written down.

[12] There is a non-material dispute regarding Alexander's appointment of plaintiff in the team leader (continued...)

*September, 1998 Promotions*

Planning for promotions scheduled to occur in 1998 began in November and December, 1997. At the time, plaintiff's second-level supervisor, who would have been responsible for recommending her for a 1998 promotion, was Brian Palmer. Palmer had consistently rated plaintiff's performance as having met the majority of her expectations and exceeding the rest, and considered her 1997 performance to be outstanding; Plaintiff highlights large portions of Palmer's deposition testimony about her work as evidence that any criticism of her performance by other managers was unjustified.[13] In February, 1997, plaintiff asked Palmer about her promotion future and specifically compared herself to Rory Ross, who had been in her training class. At that time, Palmer told plaintiff that if her work continued at the same level, she would be promoted at the same time as Ross. In December, 1997, Palmer did not recommend plaintiff for a promotion in 1998 because she had not been an Officer for three years and because she did not have any management experience.[14] Ross was promoted to 2VP in September, 1998, after two years, ten months

---

[12](...continued)
role. Defendant contends that plaintiff did not ask to be a team leader until after she learned about Employee A's appointment; plaintiff's deposition confirms this fact. However, plaintiff also contends that she approached Alexander after an independent consultant for TNT told plaintiff that **he** was going to take over the Valuations team leader role. Plaintiff implies that Alexander wrongfully failed to consider her for the team leader role until she requested it, even though she was qualified. The only evidence plaintiff has that Alexander considered the consultant is hearsay. In any event, it is not material because the evidence is undisputed that plaintiff in fact did become the team leader. Further, plaintiff argues that the consultant was unfairly made a 2VP despite performance problems, lending fuel to her argument that her failure to be promoted was evidence of discrimination. However, the undisputed evidence shows that defendant hired the consultant as a 2VP based on his experience outside the bank; he did not demonstrate performance issues until later.

[13] Since Palmer was not plaintiff's supervisor (either direct or second-level) during the period about which she complains, his analysis of her performance is not relevant to the question of whether she was qualified for a promotion in 1998.

[14] Plaintiff contends that she did have management experience prior to being made a team leader
(continued...)

9

as an Officer.[15] At the time, plaintiff had been an Officer for two years, three months.

*Promotion History of Alleged "Comparable" Employees*

Plaintiff points to two overlapping categories of TNT employees that she considers her "peers" for the purpose of demonstrating that non-African-American employees were promoted from Officer to 2VP more quickly than she was. However, an analysis of these individuals is somewhat complicated by the existence at TNT of two separate "tracks" toward promotion, the management track for those employees who supervise other employees, and the technical track, for employees who do not supervise anyone else, and who instead focus on the building, installation, and running of computer systems and applications. As we explained above, both tracks require at least three years as an Officer before promotion to 2VP. What makes things complicated is that in June, 1998 – three months prior to the date plaintiff contends she should have been promoted – she became a team leader, which effectively switched her from the technical track (where she had been since the start of her employment) to the management track, and part of defendant's explanation for not promoting her in less than three years is her lack of management experience in September, 1998. We will explain how we address these facts below.

The first group of alleged comparables consists of those individuals from plaintiff's

---

[14](...continued)

in June, 1998 because she had "managed the team for her supervisor, Sharon Alexander, almost single-handedly, except for preparing the budgets, administering performance reviews and paying contractors." However, plaintiff does not have any evidence for this contention other than her own affidavit, and defendant specifically denies that plaintiff's work for Alexander was considered management experience.

[15] Neither party adduces any evidence regarding whether Palmer believed that plaintiff was maintaining the level of performance she had attained in 1997 at the time Ross was promoted in September, 1998. At that time, Palmer was no longer plaintiff's second level supervisor and did not have input into her promotions. However, it is undisputed that he did not recommend her for a promotion during the December, 1997 planning process.

training class, Ross, Chark and Weller, whom we discussed earlier. As we explained, none of the three were working in the TSD at the time of their promotions, nor did they have the same supervisors as the plaintiff. Further, there is no evidence regarding what these employees' duties were or whether they were on the "technical track" or "management track" at the time of their promotions.

In February, 1999, plaintiff identified for defendant a group of employees on the technical track whom she believed were promoted to 2VP in less than three years, and whom plaintiff contends are her comparables. The individuals she identified were Employee E, Employee D, Thomas Zak, Employee C, Rory Ross and Wing Chark. Of these individuals, Employee E was promoted to 2VP in three years and three months, the same time frame as plaintiff's promotion. According to defendant, Employee D and Employee C were both outstanding performers; Employee D was promoted in two years, eleven months and had extensive management experience and Employee C was promoted in two years, four months.[16] Neither Zak nor Chark were employed in the TSD at the time of their promotions. Further, plaintiff also questioned whether employees Employee A and John Snyder, to whom she compared herself, would be promoted in less than three years even though they were on the same "track" as she was. In fact, Employee A was promoted in three years, two months and Snyder left defendant's employ prior to receiving a

---

[16] We assume, based on the information provided to us, that both Employee D and Employee C were in the TSD but had different supervisors than the plaintiff. Plaintiff denies the fact that the two were outstanding performers because defendant was unable to produce full sets of signed performance reviews for them. However, plaintiff does not explain why performance appraisals need to be signed to be accurate, and has no evidence to dispute defendant's contention that Employee D and Employee C were outstanding employees. Absent any evidence that defendant did not honestly believe its evaluations or reasons for promoting Employee D and Employee C in less than three years, we will not upset them. *See, O'Regan v. Arbitration Forums, Inc.,* 246 F.3d 975, 984 (7th Cir. 2001).

promotion.[17]   Of all the employees plaintiff identifies, we find Employee A to be the most

similarly situated to plaintiff.  Not only did he also report to Sharon Alexander, but like

plaintiff, he switched from the technical track to the management track with his appointment

to team leader in 1998, right in the middle of his tenure as Officer.

## Plaintiff's Belief that She was Qualified for an Early Promotion

Many of plaintiff's reasons for believing that she was qualified to be promoted to 2VP

in September, 1998 stem from her own personal assessment of her performance.   She

notes that she worked long hours and that in 1998, the TSD had more deadlines than any

other year.  Further, she points to the fact that the Valuations team was involved in three

of the five largest TSD projects at the time.  There is little dispute that the Valuations team

was busy working on important projects in 1998.  However, this, along with plaintiff's self

evaluation, does not amount to the undisputed fact that she was qualified for promotion at

that time.  Indeed, the evidence shows that all the teams in the TSD were busy in 1998

because the TSD was busy and because the entire bank was simultaneously trying to

prepare for Y2K.   Defendant does not deny plaintiff's beliefs, but explains that not every

hard working employee who received good performance reviews was automatically entitled

to an early  promotion.  And a plaintiff's self-serving opinion about her qualifications,

unsupported by other proof, is insufficient to create a question of fact. *See, Schultz v.

General Elec. Corp.,* 37 F.3d 329, 334 (7th Cir. 1994).

---

[17] Plaintiff identified as comparables only on those individuals whom she believed were promoted in less than three years.  However, other evidence provided by the defendant shows that there were at least two other "technical track" employees who worked in the TSD and who were promoted in more than three years: Charles Kim was promoted in five years, four months, and David Lundy was promoted in three years, four months.

*Plaintiff's Complaints of Discrimination*

Plaintiff met with Alexander and Vicino on September 28, 1998 to discuss the reasons she had not been promoted to 2VP. All three individuals documented the issues discussed at the meeting in memoranda. It is undisputed that Alexander and Vicino told the plaintiff that she needed to gain more management experience, since she had only recently undertaken her first management role. They also agreed that she was on the right track to receive a promotion. On September 22, 1998, plaintiff asked defendant's Human Resources Consultant, Terri Reed, if plaintiff's failure to be promoted was because of her race. Reed informed both Magrini and Vicino that plaintiff had mentioned her race at this time. In November, 1998, plaintiff again met with Reed to discuss her promotion history and Reed told plaintiff to meet with defendant's EEO officer, Richard Bordelon. Plaintiff met with Bordelon in December, 1998 to discuss why she had not been promoted and to complain that she thought it was because of her race. There was apparently no resolution of plaintiff's concerns at this time, but Bordelon planned to convene a meeting with plaintiff, Magrini, Alexander and Vicino for early 1999 to continue discussing the issue.

*Plaintiff's Removal as Team Leader*

In April, 1999, Vicino had plaintiff begin reporting directly to her, instead of Alexander, and in June, 1999, plaintiff was removed from her position as team leader. During the summer of 1999, plaintiff searched for a new position within defendant; eventually, in October, 1999, she began reporting directly to Palmer. Plaintiff contends that from September, 1998 – when she first asked Reed if her failure to be promoted might be related to race – until her removal as team leader, defendant pursued a course retaliation against her.

In her Rule 56.1 statement of additional undisputed facts, plaintiff painstakingly details various events she contends prove that defendant was setting her up to fail as a team leader in retaliation for her complaints of discrimination. Many of these events are set forth via e-mail conversations between plaintiff's supervisors and other employees of TNT; plaintiff also relies on her performance reviews and those of several other employees as evidence for her claims. As we explain below, some of plaintiff's allegations rely on her own speculation about the meaning or interpretation of various documents, which are not supported by the evidence. However, there is a dispute of material fact regarding the ultimate reason plaintiff was removed from her team leader position and the efforts defendant made to find her another position, and for this reason, we must deny defendants' motion for summary judgment with regard to plaintiff's claim of retaliation.

In order to narrow the remaining issues, however, we will first set forth those allegations for which plaintiff's speculations are not supported.

      **a.**   **Staffing**

First, plaintiff contends that during November and December, 1998, defendant failed to provide her team with adequate staffing to complete the projects assigned to it. What the evidence shows is that plaintiff herself did not believe she had enough staff, but defendant felt that the team was adequately staffed. It is true that, although both plaintiff and Employee A were given project leaders when they acted as team leaders, plaintiff's project leader, Employee B, was removed from her team at some point and plaintiff acted as her own project leader.[18]

---

[18] Other than her own perception, plaintiff's only other proof that her team was understaffed comes
(continued...)

### b.   Recognition of plaintiff as team leader

Next, plaintiff complains that defendant did not do enough to "advertise" the fact that she had been made team leader, so other employees failed to go to her for help on Valuations issues.   The evidence shows that on one occasion, an employee asked Alexander a Valuations question instead of plaintiff, and plaintiff complained.   Alexander sent out a memorandum instructing employees to consult with plaintiff instead.   On the same day plaintiff complained to Alexander, another employee (not a manager or supervisor) sent out a memorandum which failed to include plaintiff's name as a contact regarding a particular installation.   Plaintiff responded by sending that employee an e-mail in which she "complained bitterly" about being excluded.   Plaintiff contends that this incident demonstrates that other employees did not recognize plaintiff as a team leader, and that the lack of recognition was caused by her supervisors' retaliatory behavior towards her. However, none of the evidence she presents supports this speculation.[19]

### c.   Holiday scheduling problems

Another incident which plaintiff contends demonstrates retaliation concerns holiday scheduling, which involved, *inter alia*, the Valuations team and several Operations teams.

---

[18](...continued)
from an affidavit of a subordinate on her team.  However, that individual does not have personal knowledge of the staffing situations on other teams, or the scope of the projects undertaken by other teams.

[19] For example, plaintiff's does not provide any evidence that she had previously asked the employee in question to include her name on contact lists.  Further, her evidence that the employee later apologized is a statement contained in plaintiff's affidavit and thus is inadmissible hearsay.  In any event, the event does not, as plaintiff speculates, show that she was not considered a team leader by other employees.  Indeed, during a conversation between Alexander, Vicino and plaintiff that took place a couple of weeks later, (and which all three women documented in memos), Vicino gave an example of a similar situation in which she was not consulted about a particular installation when she should have been.  Vicino explained that these sorts of omissions were common, across-the-board problems that needed to be "chipped away at" a little at a time.

Plaintiff devotes sixteen paragraphs of alleged facts to a situation regarding scheduling in November, 1998 (for the Veteran's Day holiday). Apparently, there was an error in one application that ran during the holiday, and five hours of work were lost.[20]   After this incident, Vicino and plaintiff had a meeting, during which Vicino noted that the error had been made by a problem contractor whose contract plaintiff had terminated. Vicino told the plaintiff that she should have mitigated the risk of having the problem contractor perform the installation.[21]

Also in November, 1998, Joe Wilson, the leader of an Operations team informed Alexander and Vicino via e-mail that, in his opinion, plaintiff had failed to respond to certain requests "either promptly or without coercion." The memo also noted that Operations team members had complained to Wilson that the plaintiff had behaved in an argumentative and unprofessional manner on more than one occasion.[22]   Several weeks later, the head of the Operations staff sent an e-mail to Alexander asking that the Operations team be assigned a contact other than plaintiff. Defendant admits that it did not show these specific e-mails to the plaintiff, but the evidence shows that on more than one occasion, Vicino and Alexander discussed with the plaintiff her need to watch the tone and tenor of her communications.[23]

---

[20] Contrary to the plaintiff's allegations, there is no competent evidence that the Operations staff improperly responded to the error when it was discovered.

[21] Vicino's memo to plaintiff on the issue does not explain how plaintiff should have mitigated the risk.

[22] This statement is not hearsay because it is not being offered to prove plaintiff's behavior, but only to show the effects of the complaints, that is, that certain operations employees complained about plaintiff and that Vicino and Alexander were informed about the complaints.

[23] One example is the incident set forth above, where plaintiff admits she "complained bitterly" via e-
(continued...)

There are other incidents to which the plaintiff cites, but they all follow a format similar to those presented above: plaintiff identifies a series of e-mail conversations and alleges that they prove defendant was criticizing her work or performance unfairly, or generating negative comments about her without allowing her to respond. Without having to detail each of them, we note that, unless otherwise stated, we find that the evidence merely shows that in late 1998 and early 1999, plaintiff's supervisors (Vicino, Alexander and Magrini) and several other employees in the TSD and Operations groups had e-mail conversations that at times discussed problems one or more employees was having working with the plaintiff.[24] In so finding, we do not accept as true any of the allegations in the e-mail, we only note that they represent the communications about plaintiff received by or sent by her managers. In summary, we do not find any evidence to support plaintiff's contention that defendant purposely tried to discredit her in front of her peers or superiors. At most, there are differences of interpretation regarding various events.

However, as we stated above, there are certain other events surrounding plaintiff's removal from the team leader position for which there is a genuine dispute of fact. It is these events that prevent us from granting summary judgment on plaintiff's retaliation claim.

---

[23](...continued)
mail to another employee who excluded her name from a contact list.

[24] Contrary to plaintiff's contention, there is no evidence that any of her managers purposely solicited negative e-mails about the plaintiff or manipulated evidence about her. It is true that on one occasion, Alexander e-mailed another employee to ask her about the status of a project involving that employee and the plaintiff, and in the e-mail mentioned that Alexander was not getting a "warm and fuzzy feeling about the project." However, no evidence supports plaintiff's speculation that her supervisors were sending out e-mails like this in order to damage plaintiff's reputation. Instead, the communications regarding plaintiff appear to be legitimate discussions about the work occurring in the TSD, areas where improvement was needed, and concerns about deadlines, schedules, communications, etc.

In February, 1999, Alexander gave plaintiff her performance review, first orally, and then by providing a written document. Both the plaintiff and Alexander wrote a memorandum setting forth their own version of the matters discussed at plaintiff's oral review; Vicino asked plaintiff to re-write her summary to reflect several counseling items Alexander had discussed, but plaintiff refused, as she believed her own version of the discussion was accurate. It is undisputed that although plaintiff had several meetings with Vicino and Alexander concerning the review, the three never came to a complete agreement regarding Vicino's and Alexander's assessment of plaintiff. In this review, plaintiff was graded as having met the majority of her expectations and exceeding the remainder, the same overall assessment as she had received the previous year. Plaintiff's objections with the review stemmed from the fact that she believed she should have been rated as exceeding the majority of her expectations. The review also noted that plaintiff needed to continue to progress on her team leader/management skills, as was to be expected for someone who had recently moved into a management position. Further, the review stated that "[n]oted improvement needs to be seen in six months otherwise a role reassessment will need to take place."

In June, 1999, plaintiff was removed from her team leader position. The parties dispute many of the material facts that led to the removal, including the importance of the six-month improvement plan described above. Most importantly, the parties disagree as to whether plaintiff requested that she be removed from the team leader role or instead, defendant took the step because of continued problems with plaintiff's leadership abilities.[25]

------

[25] For example, in early 1999, there are several more series of e-mails regarding plaintiff. One set
(continued...)

For example, plaintiff contends that after she refused to re-write her February, 1999 summary of her review, Vicino told her they could no longer work together and that plaintiff would have to find another position at the bank. Additionally, Vicino sent a memorandum to Reed in March, 1998, that refers to Vicino's request from December, 1998, that they let plaintiff "move on".

Defendant disputes the characterization that it removed plaintiff from her team leader role because of her performance, and the evidence does not completely support either parties' version.[26] Defendant alleges that it only began looking to remove plaintiff from her team leader position after she herself requested a change to a non-management role, and that Magrini agreed to let her remain as team leader until she found a different position in the bank. According to defendant, by June, 1999, Vicino had become sufficiently concerned about plaintiff's management skills that Magrini decided to take plaintiff out of the team leader position then, even though she did not have another position. Plaintiff's version of the facts is that she only agreed to leave her team leader role and look for another technical track position after it became clear that defendant was not going to let her stay a manager, despite her desire to do so. It is undisputed that Magrini told plaintiff in June, 1999 that she would no longer be a team leader and that she was expected to help in the transition of the new team leader, Andrea Ford (Caucasian), who had been working

---

[25](...continued)
of e-mails concerns her attendance at meetings; she contends that she had permission to miss the 8:30 a.m. meetings and that either Alexander or one of plaintiff's subordinates would attend in her place. The evidence does not really establish what defendant's expectations were with regard to the meetings.

[26] Although defendant insists that plaintiff's testimony about Vicino telling her they could not "move forward" related solely to the re-writing of the review, the evidence is simply not there to dispute plaintiff's contention that Vicino told her she would have to find a new position.

with the Valuations team for several months.

In any event, during the Summer of 1999, plaintiff looked for another position within defendant and took various training classes that she needed to help her get a new job at TNT.[27] Although defendant contends that it offered her several viable options for new positions at this time, there is a question of fact about the viability of all of them as positions that would help plaintiff grow in her career.[28] It is undisputed that plaintiff had no substantive work to perform during the summer of 1999. It is also undisputed that when plaintiff was removed as team leader, defendant moved her to a new cubicle that was identical to her old one, except for the fact that it did not have a window. Plaintiff was not allowed to take her phone or computer with her (she got new ones), but the evidence shows that other employees moved without taking their old equipment with them, including Ford, who took over plaintiff's team leader position.

Another dispute concerns defendant's contention that at the same time as plaintiff was removed from her team leader position, defendant removed Employee A, because he was also having problems working in a management role. The evidence does not support this contention. Instead, the evidence shows that Employee A received positive performance reviews (and no six-month improvement plan) and that although he left his role as team leader for the Application 1 application, he first moved to another team leader

---

[27] Although plaintiff contends that she only took training classes because she had nothing else to do, the evidence shows that she had been denied several jobs within the bank because of her lack of certain training experience.

[28] For example, Vicino offered plaintiff a job as Application 2 team leader, but plaintiff alleges, and some of the evidence shows, that there really was no "Application 2 team", and that Application 2 was simply a computer application that was used in the TSD. Another possible job would have had plaintiff working under Andrea Ford, the individual who had replaced her as Valuations team leader.

20

position that interacted with more senior employees at defendant. When Employee A did eventually leave this team leader role to take on a more technical architect position again, the impetus for the move appears to come solely from Employee A himself.

Finally, plaintiff argues that after she was removed from her team leader position, other employees shunned her, specifically, she alleges that Vicino, Reed, Alexander and Ford refused to talk to her. The evidence is conflicting, as the named individuals deny shunning plaintiff, and she contends that they did. Thus, there is a dispute, but as we explain below, its not material.

Plaintiff was promoted to 2VP in September, 1999, when she had been an Officer for three years, three months. She contends that her promotion had originally been scheduled to occur in early 1999, but that Vicino had moved it back out of retaliation for plaintiff's complaints. The evidence does suggest that there may have been discussions about whether to time plaintiff's promotion in the Spring of 1999 instead of in September, but no evidence shows that an earlier time was ever decided upon and then changed later. Further, the undisputed evidence shows that it was not unusual for defendant to change the timing of an employee's promotion. Exactly three years later, in September, 2002, defendant promoted plaintiff to Vice President, the title she holds currently.

**Legal Analysis**

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). We must evaluate the admissible evidence supporting the motion in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby,*

21

*Inc.*, 477 U.S. 242 (1986). "Rule 56(c) mandates summary judgment when the nonmoving party fails to establish the existence of an element essential to its case and on which that party will bear the burden of proof at trial." *Jefferson v. City of Chicago*, No. 97 C 4895, 2000 WL 1368036 (N.D.Ill., Sept. 15, 2000) (citing *Anderson*, 477 U.S. at 252).

Stallings-Daniel may use either direct or indirect evidence to demonstrate that the defendant discriminated against her on the basis of his race. *See Simmons v. Chicago Bd. of Ed.*, 289 F.3d 488, 492 (7th Cir., 2002). In this case, as in most employment discrimination matters, there is no direct, or "smoking gun" evidence, so plaintiff must proceed under the indirect method first set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* method, plaintiff must first make a prima facie case of discrimination. In a failure to promote case, this involves demonstrating that: 1) she was a member of a protected class; 2) she was qualified for the position sought; 3) she failed to receive the position; and 4) the employee promoted was not a member of the protected group and was less qualified than the plaintiff. *See Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 732 (7th Cir., 2001).

Once the plaintiff makes a prima facie case of discrimination, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for its action. After the defendant satisfies its burden, it is up to the plaintiff to demonstrate that the defendant's reason is pretextual, that is, a lie, or not the real reason for its action. To prove pretext, the plaintiff must show: 1) defendant's explanation for its actions had no basis in fact; 2) the explanation was not the real reason; or 3) the reason given was insufficient to support the action. *See, Hoffman-Dombrowski v. Arlington International Racecourse, Inc.*, 254 F.3d 644,

652 (7th Cir. 2001).

We grant summary judgment for the defendant on plaintiff's failure to promote claim because, even assuming plaintiff can make a prima facie case of discrimination, there is no evidence that defendant's reasons for not promoting her prior to September, 1999 are pretextual.[29]

Although we find that plaintiff was not qualified to be promoted to 2VP in September, 1998, we must evaluate her qualifications in a rolling time frame up to the date of her promotion a year later. As we explained above, we find no dispute that defendant had a general guideline that an employee have two-to-four years as an Officer before becoming eligible for promotion to 2VP, and that the Technology Unit generally required three years. Further, we find that in September, 1998, the plaintiff had been an Officer for only two years, three months. Even assuming that promotions in the Technology Unit could sometimes occur in less than three years, we have not found a single employee who was promoted in as little as two years, three months. One employee was promoted in two years, four months, but the majority of employees promoted in less than three years were promoted just several months shy of that mark. Thus, we find that for the purposes of making a *prima facie* case, plaintiff was qualified for promotion, at the earliest, around April or May, 1999, when she had been an Officer for two years, ten months.

Defendant also argues that plaintiff fails to show that a similarly situated, non-African-

---

[29] We recognize that our analysis of plaintiff's failure-to-promote claim is slightly different than a typical one in which a number of employees, including the plaintiff, vie for a single available promotion. In this case, the decision about whether and when to promote plaintiff to 2VP was made independently of the decisions regarding other employees' promotions. Defendant did not have a set number of "slots" to fill at any one time, so plaintiff never competed against any other employee for her official promotions. However, because she contends that non-African-American employees received official promotions faster than she did, we will use the standards for finding a *prima facie* case set out above.

American employee with less qualifications than the plaintiff was promoted in fewer than three years, and thus, she cannot fulfill the fourth factor for making a *prima facie* case. Its true that the evidence shows that all individuals promoted in less than three years were considered stellar employees, and that many of them were not similarly situated to plaintiff because they worked outside the TSD and had different supervisors. However, making all inferences in favor of the plaintiff, we will find that she just manages to prove that she was at least <u>as</u> qualified as some of the promoted individuals, since it is undisputed that Palmer considered her work (through December, 1997), to be outstanding. There is no evidence, however, that plaintiff was more qualified or had more management experience than any of the individuals promoted in less than three years.

So we find that plaintiff succeeds in making a *prima facie* case of discrimination, which transfers the burden to defendant to provide a non-discriminatory reason for its actions. Defendant's explanation for not promoting plaintiff earlier than September, 1999 is twofold. First, it explains that plaintiff did not have three years experience as an Officer to make her generally eligible for promotion in 1998. Second, none of plaintiff's supervisors – even Palmer, who considered her outstanding – believed that she was ready or qualified to be promoted in less than three years. Particularly, defendant noted that plaintiff did not have enough management experience to be promoted earlier, a relevant consideration since she had recently transferred from the technical track to the management track.

Plaintiff contends that defendant's reasons for not promoting her were pretextual because, in her opinion, she was more than qualified to receive a promotion in September,

1998, and also because defendant's explanation for not promoting her changed over time.[30]

First of all, plaintiff's subjective opinion of her performance is not adequate evidence to support her argument that she should have been promoted earlier. *Schultz*, 37 F.3d at 334. Further, plaintiff's allegations do not even create a question of fact regarding whether defendant should have promoted her earlier. It is true that Palmer considered her work to be outstanding. However, its also true that Palmer was also the individual who would have recommended plaintiff for a promotion in 1998, and he did not do so. Contrary to plaintiff's allegation that there is at least a question of fact about whether her performance was outstanding enough to merit an early promotion, the undisputed evidence shows that defendant merely had the discretion to promote employees in less than three years, but nothing in its guidelines or regulations required it to do so.

So, even if we accept plaintiff's own characterization of her performance, she fails to show that defendant did not legitimately believe that she was not ready to be promoted in 1998. And plaintiff does not adduce any evidence to call into question the promotions of individuals promoted in less than three years, especially since many of them worked in different divisions from plaintiff, and none had the same supervisors.[31]

Next, instead of defendant's two reasons for not promoting plaintiff (length of time

---

[30] Plaintiff contends that when she first complained to Vicino and Alexander in September, 1998, they told her she did not have enough experience to be promoted at that time, but that she was on the right track. Plaintiff contends that defendant later told her that, because she was on the technical track, she needed three years of experience before becoming eligible for promotion.

[31] Plaintiff offers no evidence to shed doubt on defendant's contention that the promoted employees were stellar performers, and as explained above, we cannot upset that contention. As plaintiff identifies only those employees whom she believes were promoted in less than three years, it makes sense that all of them would be considered outstanding; the parties do not discuss the number of employees who were promoted in three or more years.

as Officer and lack of experience) contradicting each other, as plaintiff argues, they are actually consistent. First, the evidence supports defendant's general adherence to the three year guideline for promotion; even most employees promoted in less time were only earlier by a few months. And although plaintiff doesn't mention it, the defendant provides evidence of several non-African-American employees whose promotions took even longer than the plaintiff's. Thus, there is no evidence that defendant was lying about the three year rule, or that it did not believe it to be the real reason plaintiff was not promoted earlier.[32]

Second, defendant's explanation that plaintiff was not qualified to be promoted earlier because lack of management experience is consistent with the general three year rule. Indeed, the evidence shows that as soon as plaintiff began questioning her failure to be promoted, Vicino explained that defendant's guidelines for promotions differed somewhat depending on whether an employee was in a management or non-management (i.e., technical) position. In September, 1998, plaintiff had recently switched from the technical track to a management position. Thus, there is nothing suspicious about defendant justifying its failure to promote her earlier by noting her lack of management experience. Vicino and Alexander assured plaintiff that she was "on track" for a promotion to 2VP, which is basically the same explanation given to her later, in early 1999, that she had not been an Officer for three years. Finally, although plaintiff protests that we should give greater weight to defendant's general promotion guidelines, which call for promotion from Officer to 2VP

_____

[32] Indeed, plaintiff herself recognizes the applicability of the three year rule in trying to justify why Palmer, who considered her work to be outstanding, did not recommend her for promotion in 1998. Plaintiff contends that at the end of 1997, Palmer was unaware that outstanding employees could be promoted in less than three years, and if he had known, he would have recommended her for a promotion at that time. No evidence supports this contention, but it does show that plaintiff recognized that there existed a general three-year time frame for promotion.

in two-to-four years, the existence of these guidelines do not demonstrate that defendant's reasoning is pretextual. By promoting plaintiff in three years, three months, defendant was explicitly complying with these general guidelines as well.[33]

Thus, we grant summary judgment to defendant on plaintiff's Title VII and § 1981 discrimination claims.[34] Because there is no evidence to support plaintiff's theory that defendant failed to promote her to 2VP prior to September, 1999 because of her race.

## Retaliation Claim

The Seventh Circuit has recently clarified that the standards for proving a claim of retaliation mimic those set forth in *McDonnell Douglas*. That is, a plaintiff can prove retaliation by showing that 1) she engaged in a protected activity (such as complaining of discrimination); 2) defendant subjected her to an adverse employment action; 3) other similarly situated employees who did not complain were not subject to retaliation, and 4) she was performing her job satisfactorily. *Stone v. Indianapolis Public Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002). The defendant must then articulate a non-discriminatory reason for its actions which the plaintiff may then try to rebut. *Id.* at 644. The plaintiff no longer needs to prove that there is a causal link between the protected action and the adverse employment action. *Id.*

---

[33] There is also nothing pretextual about evidence that defendant may have discussed promoting plaintiff at an earlier point in 1999. Defendant does not deny that such an earlier promotion was discussed, but none of the evidence shows that plaintiff was ever definitely slated for an early promotion. Instead, it was continually decided that she was not yet ready, which comports with defendant's explanation that she was not qualified for promotion until September, 1999. Further, the undisputed evidence shows that even after an employee is slated for promotion during the planning process in the previous year, his or her managers may move the promotion date forwards or backwards, or add or subtract employees from the list as the year progresses.

[34] The standards for determining violation of § 1981 are the same as those that govern Title VII. *See Gonzalez v. Ingersoll Milling Mach. Co.*, 133 F.3d 1025, 1035 (7th Cir. 1998).

In this case, there are several disputes of material fact that prevent us from granting summary judgment for defendant on plaintiff's retaliation claim. Although defendant attempts to downplay plaintiff's early complaints of discrimination, making all inferences in her favor, we find that by the end of September, 1998, plaintiff had sufficiently raised the issue of race and her failure to be promoted to 2VP to satisfy the requirement that she had engaged in a protected action.

The questions of fact arise when we examine whether and to what extent plaintiff suffered an adverse employment action after she complained, whether a similarly situated non-complaining employee was treated differently, and whether defendant's reasons for its actions are honest.

Despite plaintiff's statement that the notion of an adverse employment action must be defined broadly, its also true that an adverse action must consist of "more than a 'mere inconvenience or an alteration of job responsibilities'" to be actionable. *Oest v. Illinois Dept. of Corrections* 240 F.3d 605, 612 (7th Cir. 2001) *cited in Thomas v. The Habitat Co.* 213 F.Supp.2d 887, 896 (N.D.Ill. 2002). For our purposes, the Seventh Circuit has included within the realm of materially adverse actions such things as "a less distinguished title", "significantly diminished material responsibilities, or other things that might be unique to a particular situation." *Id.* at 612. Further, the Seventh Circuit will look to a number of alleged adverse actions in the aggregate to determine if together, they rise to the level of materiality. *Thomas*, 213 F.Supp. at 897. Certain actions, however, are not considered materially adverse, such as shunning by other employees, *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1029 (7th Cir. 1998), or minor alterations in work location, *Stutler v. Illinois Dept.*

*of Corrections*, 263 F.3d 698, 704 (7th Cir. 2001).

We agree that plaintiff's loss of her team leader position, and the fact that she had no duties or responsibilities for nearly four months are sufficient to show that she suffered an adverse employment action. Even though plaintiff never lost her salary or title, we find that her removal from a management position, especially because she was given no other job responsibilities in return, is sufficiently adverse. However, we find that any alleged shunning by employees, plaintiff's move to another location, and defendant's refusal to let her take her own computer and phone, are not adverse. We must deny summary judgment because there are questions of fact regarding both defendant's reasons for its adverse actions as well as its contention that it treated Employee A the same as plaintiff when it removed him from his team leader position despite the fact that he had never complained of discrimination.

Defendant contends that it only began thinking about removing plaintiff from her team leader position after she requested it; plaintiff flatly denies this allegation and the evidence shows that as far as she was concerned, she would accept a non-management role only to save her job at TNT. And there are similar discrepancies with respect to Employee A's move back to a non-managerial architect role. Defendant argues that its removal of plaintiff could not be retaliatory because it treated Employee A the same way. In his case, however, the impetus for the move seems to have come from Employee A himself, and conspicuously absent is any six-month improvement plan like that given to the plaintiff.

And other facts surrounding plaintiff's loss of her team leader position and defendant's attempt to find her new work are similarly contradicted. Although defendant contends that it offered plaintiff several viable options for work during the summer of 1999,

a jury is entitled to determine whether defendant really believed the opportunities were legitimate and would help advance plaintiff's career.

Plaintiff has provided a sufficient rebuttal to defendant's explanations for removing her from her team leader role to defeat summary judgment on her retaliation claim. Defendant argues that any inference that plaintiff suffered an adverse employment action is belied by the fact that plaintiff has continued to work at defendant, and has even received two promotions since being removed from her team leader role. However, in this case, defendant's contentions relate only to plaintiff's damages, not the question of whether she was retaliated against at all.

For the reasons stated above, defendant's motion for summary judgment is granted with respect to plaintiff's claim of race discrimination and denied with respect to her claim of retaliation. It is so ordered.

ENTER:

MICHAEL T. MASON
United States Magistrate Judge

Dated:   July 29, 2003

G:\Opinions\01C2290codes.wpd